NOT DESIGNATED FOR PUBLICATION

No. 113,513

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EDDIE ANTHONY GORDON, SR.,
*Appellant.*

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed May 6, 2016. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., LEBEN, J., and HEBERT, S.J.

LEBEN, J.: Eddie Anthony Gordon, Sr., pled guilty to second-degree intentional murder, and the district court sentenced him to 285 months in prison. Eight months later, Gordon filed a pro se motion to withdraw his guilty plea, but after an evidentiary hearing, the district court denied it. Gordon appeals, arguing that he was misled into pleading guilty and that he didn't understand the plea. But the record shows that both Gordon's attorneys and the district court fully and accurately explained the plea agreement to Gordon, who knowingly and voluntarily chose to plead guilty. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Gordon with first-degree felony murder, attempted aggravated robbery, conspiracy to commit aggravated robbery, aggravated burglary, and aggravated assault. Under a plea agreement, Gordon pled guilty to second-degree intentional murder; in exchange, the State dismissed the other charges. As part of the plea agreement, the State and the defendant agreed that Gordon's criminal-history score was C. (Under Kansas sentencing guidelines, potential sentences are greater when the defendant has more or more serious past crimes. A defendant's criminal-history score can range from A, the most serious, to I, the least serious.) Under the sentencing guidelines, the possible sentences for second-degree intentional murder with a criminal-history score of C were 258 months (mitigated), 272 months (standard), and 285 months (aggravated). The plea agreement permitted each side to argue for any of those three sentences.

Gordon was represented by two experienced public defenders, Stacey Donovan and Wendell Betts. Donovan had represented Gordon in at least three previous cases. Between them, Donovan and Betts had defended at least 75 first-degree-murder cases.

At the plea hearing on October 7, 2011, Gordon told the district court that he understood the terms of the plea agreement and had reviewed the amended complaint with the single second-degree-murder charge. The district court explained that Gordon could be sentenced to between 258 months and 285 months in prison, and Gordon said he understood. The court then reviewed all of Gordon's trial rights, and Gordon said he understood and waived those rights. The State presented the underlying facts, and Gordon admitted to the crime.

The district court then asked Gordon a series of questions to confirm that his plea was knowing and voluntary. Gordon stated that he had had enough time to consider the

2

plea and that he hadn't been threatened or promised anything in exchange for the plea. Gordon agreed that he had discussed possible defenses with his attorneys and that he understood he would be giving up those defenses. He told the court he had been diagnosed with a mental-health condition and was taking prescription medication for it; he couldn't recall the name of the condition, but he said he understood everything that was going on. The court confirmed that Gordon could read and write and that his attorneys had read the plea agreement to him. Gordon didn't have any questions, and the court accepted his plea.

At the sentencing hearing 1 week later, the court imposed the aggravated sentence, 285 months in prison, with 36 months of postrelease supervision.

Eight months later, in June 2012, Gordon filed a pro se motion to withdraw his plea. Part of Gordon's motion alleged that his counsel had been ineffective, so Donovan and Betts withdrew from the case, and the court appointed Gordon a new attorney. The same judge who had accepted Gordon's guilty plea and sentenced him held a hearing at which Donovan, Betts, and Gordon all testified.

Donovan testified that she had reviewed the evidence in the case and discussed it with Gordon. She explained that she had created a chart of good facts, bad facts, and neutral facts and used it to help explain the case to Gordon. She said that she hadn't told Gordon he had "no defense" but had discussed with him that his defense wasn't very good.

Donovan agreed that Gordon had been reluctant to take a plea deal. She said that he had gone back and forth between wanting to go to trial and wanting to plead. Donovan testified that Gordon had wanted to speak with his sister about the plea deal, so she arranged a phone call for him. After speaking with his sister, Gordon wanted to take the plea deal.

Donovan testified that she had reviewed the plea agreement with Gordon by reading it out loud to him. She said that she had written out the possible sentences (mitigated, standard, and aggravated) and explained that each side would argue for the sentence it wanted. Donovan testified that she had told Gordon that the district court alone would decide the actual sentence. She said she had only explained the possible sentences and hadn't promised Gordon the mitigated sentence, although she recognized that he was hoping for it. Donovan also testified that she had reviewed Gordon's criminal-history score with him and that he appeared to understand it.

Donovan testified that if Gordon had expressed at any point during the plea hearing that he didn't want to proceed with the plea, she would have stopped it. Gordon didn't interrupt the plea hearing at any point with questions or to change his mind. She believed that he was freely and voluntarily making a plea that he understood. Until Gordon filed his motion to withdraw his plea, Donovan hadn't been aware that he was dissatisfied.

Betts' testimony aligned with Donovan's. Betts confirmed that Gordon had initially not wanted to plead but had decided to do so after speaking with his sister. He said that he and Donovan had gone over the case with Gordon, explaining the good facts and the bad facts. Betts testified that they hadn't told Gordon that he had "no defense," just that he had a "weak defense." He said that they had explained to Gordon that his criminal-history score was C and that Gordon hadn't asked them to object to that. Betts testified that they had explained the sentencing range and hadn't promised Gordon the mitigated sentence. He said that he had told Gordon, "[W]e'll do whatever you want us to do, we'll tell you what's behind the door 1, 2, 3. You tell us what door you want to go through and that's the door we'll go through."

4

Gordon's testimony didn't substantially differ from Donovan's and Betts'. He said that he thought he would get the mitigated sentence but admitted that Donovan had read the plea agreement to him and explained the sentencing range. He also admitted that the judge had explained the sentencing range at the plea hearing. Gordon said that he believed his criminal-history score was D rather than C, but he admitted that his attorneys had explained why his score was C. He said that he hadn't asked his attorneys to object to his criminal-history score. Gordon testified that he was innocent and had wanted to go to trial but felt pressured to plead during conversations with his attorneys; however, he acknowledged that Donovan and Betts had reviewed the details of his case with him and had told him that it was his choice whether to plead. He confirmed that he had agreed to plead after talking to his sister: "That's when I talked to my sister and that's when I decided to take the plea."

The district court stated that to withdraw his plea, Gordon needed to show manifest injustice, and he hadn't done so. Gordon has appealed to this court.

ANALYSIS

Gordon argues that the district court should have allowed him to withdraw his guilty plea after he was sentenced.

We can reverse the district court's denial of Gordon's motion to withdraw his guilty plea only if Gordon can show that the district court abused its discretion. *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014); *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009). A district court abuses its discretion if no reasonable person would agree with its decision or if it makes a mistake of law or fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

5

After sentencing, a district court will allow a criminal defendant to withdraw his or her guilty plea only "[t]o correct manifest injustice." K.S.A. 2015 Supp. 22-3210(d)(2). Manifest injustice is a situation that is "obviously unfair or shocking to the conscience." *State v. Kelly*, 291 Kan. 868, Syl. ¶ 3, 248 P.3d 1282 (2011); *State v. Oliver*, 39 Kan. App. 2d 1045, 1048, 186 P.3d 1220 (2008), *rev. denied* 287 Kan. 768 (2009). Kansas courts generally consider three specific factors when deciding whether a defendant seeking to withdraw a plea has shown manifest injustice: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. *Fritz*, 299 Kan. at 154; *State v. Morris*, 298 Kan. 1091, 1100, 319 P.3d 539 (2014). Although Gordon argued at the district court that his counsel was ineffective, on appeal he doesn't dispute the district court's finding that counsel was effective—he instead focuses on the second two factors, arguing that he was misled and didn't understand the plea.

Gordon argues that he was misled and didn't understand the plea because he thought he would be getting the mitigated sentence, he thought his criminal-history score was D rather than C, his attorneys pressured him into taking the plea, and he was uneducated and isolated during plea discussions. But the record doesn't support any of these allegations.

First, Donovan and Betts both testified that they had explained the sentencing range to Gordon and hadn't promised him the mitigated sentence. Gordon essentially said the same thing: that his attorneys had explained the possible sentences to him but that he had hoped for the mitigated sentence. Additionally, the district court reviewed the sentencing range with Gordon at the plea hearing. Gordon now insists that he still hadn't understood that he could receive any sentence within that range, but it's difficult to imagine what else his attorneys could have said to help him understand—both his

6

attorneys and the judge explained the possible sentences. And Gordon said at the plea hearing that he understood this.

Second, both Donovan and Betts testified in detail about the criminal-history score. They originally thought it was D, but then they learned of a juvenile conviction that would increase it to C, and they explained that to Gordon. Gordon testified to the same conversation and admitted that he hadn't asked his attorneys to object to his criminal-history score. Also, as the district court pointed out, he wouldn't have had any grounds to object, because the criminal-history score was correct.

Third, Gordon's claims of isolation and a lack of education don't hold up. Gordon stated at the plea hearing that he could read and write, that his attorneys read the plea agreement to him, and that he fully understood the plea agreement. And everyone agrees that Donovan had arranged for Gordon to call his sister and that only after that call did Gordon decide to take the plea.

A reasonable person could easily agree that Gordon failed to show that holding him to the plea he made would shock the conscience or be obviously unfair. See *Kelly*, 291 Kan. 868, Syl. ¶ 3. The district court did not abuse its discretion when it found no manifest injustice in this case. We therefore affirm the district court's judgment.